Keating, J.
In the early morning hours of September 28, 1964, two aged domestics were brutally assaulted in a private dwelling in Brooklyn. Both were • the victims of beating, rape and sodomy. One was strangled to death.
Miss Delia Walsh, who survived the ordeal, told the police that she believed her assailant was a Negro, male, in his late teens or perhaps 20 years of age, and with a deep gravel voice. She also told them that it seemed to her, from the force- of the blows and the tightness of his grip, that he was very strong. Miss Walsh was not able to see her assailant because her face was thrust into a pillow case. Her impression as to his race was based on the sound of his voice and her impression as to his age was based on the deepness of his voice as Avell as the physical strength exhibited.
Some two weeks later, at about 5:30 in the evening, Gregory XV., then 12 years of age, Avas taken into custody. From 5:30 *58 to about 6:30 he was questioned about a crime unrelated to the crime in question by a Detective Sullivan.
Following this questioning, the respondent was interrogated by two different detectives who were assigned to the investigation of this assault and murder.
Detective Flynn, one of the two detectives engaged in this interrogation, testified that his questioning of Gregory commenced somewhere around 8:00 p.m. He first questioned him about incidents unrelated to the crime in question and not until approximately 10:30 or 11:00 p.m. did he get around to questioning Gregory about the assault and murder. During this period Gregory told the detectives a series of incredible stories. Following each narrative, Detective Flynn would tell the respondent: “ That’s not the story I want you to tell me.” Gregory would reply: “ Well give me a hint. What story do you want me to tell you! ” Whereupon Flynn would answer: “ You know the story I want you to tell me.”
Sometime between midnight and 1:00 a.m. Gregory finally got to the right story and gave a rather detailed confession. Thereupon the detectives decided that they would visit the scene of the crime and have a re-enactment. Detective Flynn testified that they drove around various sections of Brooklyn until Gregory was able, finally, to direct them to the house on Clinton Street where the crimes had taken place.
The re-enactment of the crime was completed at about 2:30 a.m. and the boy and both detectives returned to the station house for further interrogation. During this period the detectives were concerned with learning the identity and whereabouts of Gregory’s 12-year-old accomplice, Gerald S. This questioning went on until about six or seven in the morning. Gerald S. was finally picked up about 8:00 a.m. and taken to the station for questioning. After some hours of questioning there, Gerald also confessed to the crime.
That same day both boys also directed the detectives to the place where they supposedly divided the loot and split apart. By the time these journeys ended it was well into the afternoon. The remainder of the afternoon was spent at the station house waiting for the District Attorney to appear with a stenographer to take a formal confession.
*59 The District Attorney appeared at about 5:30 p.m. with a stenographer and statements were taken from both Gregory and Gerald. By the time these statements were given, Gregory had been in custody for 24 hours and Gerald for about 10 hours.
The two boys were finally deposited in Youth House at 9:30 that evening.
Before going on to the next episode in this bizarre case, some additional facts relating to this part of the case should be noted. When Gregory was first picked up, his parents were notified and they appeared at the police station. Detective Flynn stated that he informed them that an investigation of a serious nature was in progress and that, if they wanted the benefit of counsel, they were entitled to it.
The parents, whether due to ignorance or poverty, did not ask for or retain an attorney. They remained at the station house until around midnight and then left. During the period that they were in the station house they were not present at the interrogation. However, at one point Gregory was taken out to see them and, at Detective Flynn’s request, they urged Gregory to tell the truth.
The day after Gregory and Gerald were placed in Youth House, Detective Flynn discovered that Gregory was locked up in a security ward at Kings County Hospital during the time that the crimes, to which he had confessed, were committed.
Disturbed that the confessions so painstakingly extracted would prove worthless, he rushed to Youth House around midnight that evening—the evening prior to the appearance in Family Court — and interrogated Gregory about a possible escape from Kings County. During this questioning, Gregory denied that he had escaped from Kings County the night of the crime. He told Flynn, however, that he knew that others had escaped and he knew how it could be done.
The next morning at Family Court, just prior to Gregory’s appearance and the assignment of counsel, Flynn interrogated Gregory again. At this time Gregory, after first denying that he escaped, finally told Flynn that he had escaped from the security ward by using a broken spoon to open the lock on a fire exit door. Gregory also told him that he had returned to the ward — presumably almost immediately after the crime was *60 committed. Miss Walsh’s testimony would seem to indicate that the crimes were committed between 5:00 and 6:00 a.m. and that the assailant left the house between 5:30 and 6:00 a.m. Gregory was never missed at the hospital and was seen there at 7:00 a.m. that same morning. The hospital was some three and one-half miles from the place where the boys allegedly divided the loot and separated. The record indicates that the walking time at a normal pace is 50 minutes.
In any event, Detective Flynn was still not content. On October 22, 1964, three days after the respondent’s appearance in Family Court and after the assignment of counsel, he again went to Youth House and again interrogated Gregory. This visit was also of the late evening variety.
During this interrogation two officials of Youth House were present. One of them testified that, during this questioning about a spoon, Gregory continually complained that he was tired and wanted to go to bed. At several points Flynn told Gregory that if he did not tell the truth he was going to get a court order that night and have him removed from Youth House. At one point Gregory was shown a key and asked if that was the one he used to escape. At first he replied “No” and then he answered “Yes because I’m tired. I want to go to bed.”
At that session, during some three hours of interrogation, Gregory reiterated the story about breaking out by the use of a broken spoon on the fire exit lock.
During the course of the trial at the Family Court, a psychiatrist who had treated Gregory at Creedmoor testified that he had had many conversations with Gregory and that he had formed a diagnosis that Gregory was a schizophrenic. When asked what he thought Gregory’s reaction would be to the type of interrogation he had undergone, the psychiatrist replied that he believed that Gregory “ would be very anxious to get out of that situation and I think he has enough lack of judgment and lack of foresight that it wouldn’t keep him from admitting to whatever he thought was expected so that he could get out of the immediate situation.”
The statements made to Detective Flynn as well as the statements made to the District Attorney were admitted over the objection of respondents’ counsel. And the Family Court Judge found that they committed the acts charged.
*61 The Appellate Division, in a 3 to 2 decision, affirmed the order of the Family Court adjudging the respondents to be juvenile delinquents.
The dissenting Justices found that “ the statements are both internally inconsistent and inconsistent with known events not mentioned in the statements.”[1] They voiced the vígav that these inconsistencies so impaired the weight and reliability of the statements as to render them Avorthless. In addition, they indicated their belief that the statements taken from both boys during the interrogation period were involuntary and that the fundamental principles of due process mandated the exclusion of these statements. (See In re Carlo, 48 N. J. 224.)
We believe that the statements taken from Gregory and Gerald were involuntary, as a matter of law, and that due process of law, to which these boys were entitled by the command of the Legislature, as Avell as the Constitutions of the State of Nerv York and the United States, require a reversal of the order of the Appellate Division.
In People v. Lewis (260 N. Y. 171, 177) Ave held that, since Juvenile Court proceedings Avere not criminal in nature, “ there was neither right to nor necessity for the procedural safeguards prescribed by the constitution and statutes in criminal cases.” *62 We specifically held that the privilege against self incrimination was not available in such proceedings and that a defendant could he compelled to testify.
We need not here engage in an extensive re-examination of that case because we believe that the rationale underlying that opinion has been rejected by the Legislature and that the specific holding of the case has been overruled by statute.
While the Family Court -Act specifically states that the proceedings held thereunder are not criminal in nature, the various provisions made for the protection of the rights of children who are charged with juvenile delinquency are indicative of a legislative recognition of the fact that such proceedings, resulting as they do in a loss of personal freedom, are at the very least quasi-criminal in nature. As the legislative committee report states: “Any commitment — whether ‘civil’ or ‘criminal’, whether assertedly for ‘ punitive ’ or ‘ rehabilitative ’ purposes — involves a grave interference with personal liberty ’ ’. (Report of Joint Legislative Committee on Court Reorganization, Jan. 30, 1962, p. 8.)
Thus section 711 of the Family Court Act, the first section of the article dealing with juvenile delinquency, states: “The purpose of this article is to provide due process of law (a) for considering a claim that a person is a juvenile delinquent # * * and (b) for devising an appropriate order of disposition for any person adjudged a juvenile delinquent ”. The statute goes on to provide that “ At the commencement of any hearing under this article, the respondent and his parent * * * shall be advised of the respondent’s right to remain silent and his right to be represented by counsel chosen by him or his parent * * * or by a law guardian assigned by the court ” (Family Ct. Act, § 741).
The statute further provides that, following the taking of a child into custody, the police may question him for ‘ ‘ a reasonable period of time * * * [in] a facility designated by the appropriate appellate division of the supreme court as a suitable place for the questioning of children ” (Family Ct. Act, § 724).
It is clear that the interrogation here was not conducted within “ a reasonable period of time ”. Indeed the Corporation Counsel conceded he was troubled by the length of the questioning but, he argued, that is only one factor to be considered in determining *63 voluntariness and this violation in and of itself is insufficient to require the exclusion of the statements.
Assuming he is correct, wo have far more here than an unreasonable period of interrogation. We have a 12-year-old mentally disturbed child detained in custody for 24 hours with little or no sleep.[2] We have testimony from a psychiatrist that this child would make any statement just to escape the immediate situation. The Corporation Counsel, himself, states in his brief that “ Candor requires an admission that the issue of voluntariness of the confessions is a troublesome one ”.
In Haley v. Ohio (332 U. S. 596) a 15-year-old boy was arrested shortly after midnight and was questioned by relays of detectives until 5:00 a.m. No counsel was present nor was any member of his family present with him at the time. Mr. Justice Douglas’ remarks in that case (supra, p. 599) are clearly applicable here: “We do not think the methods used in obtaining this confession can be squared with that due process of law which the Fourteenth Amendment commands. What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by more exacting standards of maturity. That which would leave a man cold and unimpressed can overcome and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. * * * Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom he can lean lest the overpoAvering presence of the laAv, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned for hour after hour, from midnight until daAAm. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning.”
*64 Though the facts in the case at bar are somewhat different from those in Haley, they are equally indicative of coercion. Haley was 15, the boys here involved were 12. The fact that Gregory’s parents were present during the earlier hours of his interrogation is of little significance. They were not in the room where the interrogation was taking place nor were they informed of the nature of the crime for which Gregory was being questioned. No doubt, as ignorant of the law and their rights as the boy was, their presence in another room, when viewed in light of his mental condition, as well as the other circumstances here present, cannot alter the inevitable conclusion that these were not voluntary statements.
Moreover, the method by which the detective questioned Gregory at the Youth House on a later occasion is indicative of the tactics that were probably used during the earlier questioning.
All these factors convince us, as similar factors convinced the Supreme Court in Haley (supra, p. 601), that “this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.”
Though the period of detention and interrogation of Gerald was shorter than that of Gregory we believe, in light of all the circumstances, that his confession, like Gregory’s, was involuntary as a matter of law.
For reasons stated, the order of the Appellate Division and the judgment of the Family Court should be reversed and both cases remitted to the Family Court for disposition in accordance with* this opinion.

. The following inconsistencies appear from the record and were outlined by the dissenting Justices below: (a) the living victim of the attack heard but one voice, said to be “ deep ”; the statements assert that both appellants participated in the attack; (b) she estimated the age of her assailant at about 20 years old; (c) the homicide was by manual strangulation with great force indicated; the boys confessed to suffocating the murdered woman with a pillow; (d) after the first set of statements was obtained from the appellants, it was found that the Kings County Hospital records indicated that Gregory W. had been confined to a locked ward for psychiatric observation on the night and morning of the incident; there was no mention of the confinement in the first statements; (e) the second statements of Gregory W. then attempted to explain his confinement by asserting that he escaped from the hospital by use of a spoon or a key, committed the acts, and then returned to the locked ward of the hospital without detection, again by use of a spoon or a key; there is no evidence that a spoon could be so used or that a key was missing; (f) the first set of statements asserted that appellants had used white gloves stolen from a department store previous to the incident; how this theft had occurred while Gregory W. was in the hospital for two days prior to the incident, or where the gloves had been during this period, was not explained.

. Detective Flynn testified that: “I was speaking to Gregory from the time I first commenced this investigation until the next evening.”