**Timothy HEMINGWAY, Plaintiff,**

v.

**Robert J. HENDERSON, Superintendent Auburn Correctional Facility; Robert Abrams, New York State Attorney General; Elizabeth Holtzman, Kings County District Attorney, Defendants.**

**No. 87–CV–3806 (ERK).**

United States District Court, E.D. New York.

Jan. 8, 1991.

Vivian Shevitz, New York City, for plaintiff.

Ruth E. Ross, Asst. Dist. Atty., Charles J. Hynes, Dist. Atty. of Kings County, Brooklyn, N.Y., for defendants.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Petitioner was convicted, after a jury trial, of murder in the second degree (N.Y. Penal Law § 125.25[3]) and was sentenced to a term of imprisonment of fifteen years to life. In this proceeding, pursuant to 28 U.S.C. § 2254, petitioner seeks to set aside his conviction on a variety of grounds. In an order entered on December 16, 1988, all of the grounds raised by petitioner were rejected with the exception of petitioner's claim that his confession was involuntary. The principal predicate for the latter claim was that, "after making a statement main-

taining his innocence" to an Assistant District Attorney, petitioner "was taken out into an annexed room by [a] detective, was physically assaulted and coerced to make an involuntary confession then brought back in the presence of the Assistant District Attorney and the stenographer." Petition at 6.

The record is undisputed that, after the Assistant District Attorney first appeared to make a stenographic record of the confession, petitioner admitted being a witness to the assault on the victim but denied being involved as a participant. After this occurred, it is also undisputed that Detective Bankhead took petitioner into an adjoining room for a brief private conversation. According to Detective Bankhead, he simply reminded petitioner of the earlier admission he had made and petitioner agreed to repeat it to the Assistant District Attorney.

Petitioner did not take the stand at the pre-trial suppression hearing at which the issue of the voluntariness of his confession was challenged and there was no evidence presented there to show that he was "physically assaulted and coerced." Petitioner concededly made no contemporaneous complaint to the Assistant District Attorney or his parents (whom he was permitted to see shortly thereafter). Indeed, the stenographic transcript of petitioner's confession contains express admissions by him that no one "threatened [him] in any way to give this statement" and that he had been "treated okay by the police." Trial Tr. 368.

After the suppression hearing was concluded, petitioner's attorney argued that the stenographically recorded confession to the District Attorney was not voluntarily made. Specifically, he argued:

Now, we have a situation where the police officer says that the defendant told him a certain thing. Now, in comes a quasi judicial officer, an Assistant District Attorney, who takes a statement. Statement No. 1 places the defendant at the scene of the crime. At best, from the prosecution side, and at worst from the defense side, you have a defendant who was not part of the assault, did not plan to be part of the assault, was an onlooker. And, he did take some cigarettes which had fallen to the ground. Now, that would not, I respectfully suggest to the Court, make him a participant in the assault. It might make him a receiver of stolen goods, but, it would not make him a participant in the assault and whatever followed from the assault. Now, then, without any explanation at all, the same police officer takes this young, sixteen year old defendant into another room. I think a fair inference from his testimony is that he steered him into a certain set of admissions. He brings him back. Again, there is no proof in the record as to what was said by the police officer to the defendant, or by the defendant to the police officer, except that within a matter of minutes he was brought back and then gives a statement which implicates him right up to the hilt in the participation in the planning, in the sharing, and makes him in effect a principal in the assault, in the robbery, and whatever other legal responsibility would flow and attach to the defendant by reason of his being so implicated.

Now, I suggest, your Honor, that there is nothing in this record which would indicate a waiver and what produced a waiver on the part of this young defendant to so drastically change the concept and thrust of his testimony, from making him a mere onlooker into an actual active participant in the crime.

Hearing Tr. 161–62.

After hearing argument on this issue, the trial judge made the following findings of fact:

On December 22nd, 1976, at approximately 4 p.m., the Defendant Hemingway was placed in custody by a uniformed police officer and brought to the 13th Homicide Division offices, located in the 77th Precinct. The arrest was predicated upon information previously supplied by the Witness Davis.

Shortly after Defendant Hemingway's arrival, he was interviewed by Detective Bankhead. Detective Bankhead ques-

tioned Mr. Hemingway, who just passed his sixteenth birthday, about the homicide of one Benjamin Gartenstein, who had been robbed at Troy Avenue and Eastern Parkway on the evening of December 16th.

Prior to the statement being given, Detective Bankhead advised him that he was a suspect in this particular crime and then proceeded to advise the defendant of his rights pursuant to the mandates set forth in Miranda, and, after each right was administered, the defendant stated he understood it, and then proceeded to make a statement. There was no one else present at the time this oral statement was made to Detective Bankhead.

Mr. Hemingway stated that he and one Gregory Baldwin and a group of others left the poolroom on Troy Avenue to rip an old man off whom they saw walking down the street; he and Baldwin acted as lookouts; and after the old man was beaten and ripped off, he picked up a bag containing several cartons of cigarettes from the person of Mr. Gartenstein and sold them the next day and shared the proceeds with Mr. Baldwin.

Assistant District Attorneys Speiser and Campbell arrived at the offices of the 13th Homicide Division pursuant to a request by Detective Bankhead at approximately 4:30 p.m. and spoke to numerous individuals in regard to the homicide of Mr. Gartenstein.

At the request of Detective Bankhead, after his conversation with Hemingway, Assistant District Attorney Speiser, in the presence of Detective Bankhead and Assistant District Attorney Campbell and a reporter, questioned Mr. Hemingway at 8:07 p.m. Assistant District Attorney Speiser informed the defendant that he wished to speak to him about a robbery on December 16, 1976, on Troy Avenue, at about 12:40 a.m. Mr. Hemingway was then advised of his rights pursuant to Miranda and questions were posed to him. The statement rendered by Mr. Hemingway to the assistant district attorney was in conflict with the oral statement given to Detective Bankhead.

*Id.* at 190–92. Specifically, contrary to what he had previously told Detective Bankhead, petitioner "stated that he and one Baldwin were merely observers to the crime in question, and not participants in any manner".

At this point the questioning by the District Attorney ceased. *Id.* at 192. According to the Assistant District Attorney:

Timothy Hemingway left the room with Detective Bankhead. There were two doors in the room, there was one that goes out into the main part of the Homicide Squad area, and then there was a side door that goes into some private offices. They went out the side door to the private offices.

Trial Tr. 260.

The trial judge then made the following critical finding with regard to what subsequently transpired:

Detective Bankhead then spoke to Hemingway privately. There were others present in the room but not party to the conversation. Detective Bankhead stated to the defendant that the statement given to the assistant district attorney is not like the one you made earlier. Hemingway then stated that he would like to go back and make another statement to the district attorney; and at 8:21 p.m. Hemingway was again questioned by Speiser in the presence of Campbell and Bankhead. He was not again advised of his rights, but merely asked if he understood the rights that were previously given to him and that these rights were still in effect, and the fact that he had spoken to Detective Bankhead does not obligate him to speak to the District Attorney at all.

Hemingway then stated he wished to make a statement, and questions were posed by Mr. Speiser and the statement was made by Mr. Hemingway, which is part of this record, which coincided with the earlier statement given to Detective Bankhead. In this statement to the District Attorney the defendant admitted that he was a lookout and took property from the deceased, namely: several car-

tons of cigarettes. The interrogation ended.

Hearing Tr. 192–194.

Based on these findings of fact, the trial judge concluded that the "People have met their burden of proof and have established by proof beyond a reasonable doubt" that the crucial stenographically recorded confession was made after petitioner was advised of his constitutional rights and after he "intelligently and knowingly waived" them. Moreover, the trial judge concluded that "[t]here is no proof of any threats or coercion of any manner whatsoever, nor does the totality of the circumstances give rise to the slightest hint of any undue pressure being placed on this sixteen-year old, whose parent or parents were present in the precinct during the course of the evening." *Id.* at 194–95.

After his pre-trial motion was denied, the case proceeded to trial and petitioner testified as a witness in his own defense. On cross-examination, for the first time, petitioner testified that, after he protested his innocence and was taken by Detective Bankhead to a private room, Detective Bankhead "slapped me in the face twice and he punched me in my stomach once." Trial Tr. 363. Only after being subject to this physical abuse did he go back and confess. In his petition for a writ of a habeas corpus, petitioner explained that he did not give that testimony at the suppression hearing because his attorney failed to advise him that he had the right to testify.

■ In *Walker v. Wilmot,* 603 F.2d 1038 (2d Cir.1979), *cert. denied,* 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980), a virtually identical case, the Court of Appeals held that unless the petitioner "was specifically and fully advised by counsel or the state judge of his right to testify without adverse consequences and chose not to do so, his failure should not bar a federal hearing" on the issue of the voluntariness of his confession. *Id.* at 1042. In *Walker,*

the Court of Appeals remanded the case to the district court "to reconsider whether Walker's testimony should be taken into account in the decision on the petition for a writ of habeas corpus." *Id.* If the district court judge concluded that Walker had not been apprised of his right to testify without adverse consequence, he was to consider his present testimony in determining the voluntariness of his confession. Under such circumstances, the District Attorney was to be given an opportunity to present anything further he may wish by way of rebuttal testimony to the district court judge, who should "then decide the case on the basis of all the evidence before him." *Id.* On the other hand, if the district court judge adhered to the view that Walker was not entitled to present further evidence, "or does not credit such evidence", he was directed to enter "a fresh judgment from which an appeal can be taken." *Id.*

This case appeared to differ from *Walker* in only one respect. Unlike the petitioner there, petitioner here did testify at trial and the jury rejected the claim that his confession was not voluntary. Because a jury cannot always be relied upon to fairly assess the voluntariness of a confession, *see Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the jury's "finding" here was not dispositive. Accordingly, it was concluded that a hearing was required in accordance with the holding in the *Walker* case.

■ Such a hearing was held and post-hearing memoranda have been filed by parties. Based on the evidence at hearing, I find that the defendant was aware of his right to testify at the suppression hearing. The finding is based on petitioner's testimony at the evidentiary hearing.[1] Specifically, petitioner's attention was called to Detective Bankhead's testimony at the suppression hearing that petitioner had admitted to him he "had been involved as a lookout and had picked up the cigarettes that had fallen from the man and sold them

---

1. Petitioner's trial counsel died before he was able to testify at the hearing. The affidavit he submitted prior to his death disclaimed any "independent recollection of this case." Although he stated that it was his "practice to

advise each defendant of all his rights," he did not specifically say that it was his practice to give the advice mandated by *Walker.* Lombardo Aff., November 1, 1989.

and shared the proceeds with Gregory Baldwin". Habeas Corpus Hearing Tr. 25 (November 3, 1989). Petitioner was then asked whether he had indicated to his attorney at the time Bankhead "gave this testimony at the suppression hearing that this was not the way it happened." *Id.*

Petitioner responded that he had advised his attorney that Bankhead had not accurately related "my statement". The following colloquy then ensued:

Q Okay. Did you want to testify at this suppression hearing?

A I had told him that I had wanted to testify, but he said for me to testify at the trial.

Q Okay. And so was it your choice not to testify at the suppression hearing or—

A No, it wasn't my own choice because you know, I didn't know whether, you know, to go against him or anything like that because he supposed to be the one who helping me, supposed to know exactly what I should do and what I should not do. That's the way I had took it, so I couldn't really argue too much.

*Id.*

This testimony indicates that petitioner understood that he could testify at the suppression hearing and that he did not do so on the advice of counsel. Indeed, petitioner admitted that he knew his mother could testify at the suppression hearing, *id.* at 52, and his testimony denying that he was aware of his right to testify at the suppression hearing was evasive and not credible. *Id.* at 48–51.

The Court of Appeals in *Walker* also held that petitioner had to have been advised that he could have testified without "adverse consequences", i.e., "without the testimony being used against him in the criminal trial on the merits." *Walker v. Wilmot*, 603 F.2d at 1042. While there is no testimony that such advice was given, it is not entirely accurate to say that a defendant's testimony at a suppression hearing may not have adverse consequences. Suppression hearing testimony may be used to impeach the defendant's trial testimony.[2] Although the jury is instructed that it may only consider such statements for the purpose of impeachment, this limitation is often meaningless as a practical matter. *See, e.g., Quartararo v. Fogg*, 679 F.Supp. 212, 230 (E.D.N.Y.), *aff'd*, 849 F.2d 1467 (2d Cir.1988); *cf. United States v. De Sisto*, 329 F.2d 929, 933 (2d Cir.) ("The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as 'pious fraud,' 'artificial,' 'basically misguided,' [and] 'mere verbal ritual.' "), *cert. denied*, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). Moreover, as Justice Marshall has observed, "the opportunity for cross-examination at the suppression hearing may enable the prosecutor to elicit incriminating information beyond that offered on direct examination.... Even if such information could not be introduced at the subsequent trial, it might be helpful to the prosecution in developing its case or deciding its trial strategy." *United States v. Salvucci*, 448 U.S. 83, 96, 100 S.Ct. 2547, 2555, 65 L.Ed.2d 619 (1980) (Marshall, J., dissenting);[3] *cf. United States v. Mariani*, 851 F.2d 595, 600 (2d Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989). Finally, there is always the risk

---

**2.** While the issue has not been finally resolved, the Supreme Court has suggested that testimony given at a pre-trial suppression hearing may be used to impeach the defendant's credibility at trial. *United States v. Salvucci*, 448 U.S. 83, 94 n. 9, 100 S.Ct. 2547, 2554 n. 9, 65 L.Ed.2d 619 (1980). New York case law is consistent with this suggestion. *See People v. Vargas*, 125 A.D.2d 512, 509 N.Y.S.2d 591 (App.Div.1986); *People v. Blackwell*, 128 Misc.2d 599, 603, 490 N.Y.S.2d 457, 462 (N.Y.Sup.Ct.1985).

**3.** In *People v. Huntley*, 46 Misc.2d 209, 212, 259 N.Y.S.2d 369, 372 (1965), *aff'd* 27 A.D.2d 904, 281 N.Y.S.2d 970, *aff'd* 21 N.Y.2d 659, 287 N.Y.S.2d 90, 234 N.E.2d 252 (1967), the defendant testified at his suppression hearing that he had told the police that he did not know anything about the subject robbery, but that after the police threatened to beat him, he confessed. Because the defendant had suggested that he was innocent and that he had confessed only under duress, cross-examination going to the issue of defendant's guilt or innocence was held to be reasonable and proper.

that "a bad performance on the witness stand", S. Saltzburg, *American Criminal Procedure* 409 (1988), or an implausible story, will shore up the judge's confidence in the credibility of an otherwise questionable presentation by the prosecutor. *Cf. United States v. Weinstein,* 452 F.2d 704, 714 n. 14 (2d Cir.1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972).

The significant downside to testifying at a suppression hearing suggests that the advice which *Walker* holds should have been given is subject to significant qualification. More significantly, it is difficult to reconcile the holding in *Walker* with the decisions of the Supreme Court in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), which plainly hold that a deliberate decision by defense counsel not to move to suppress evidence or not to object to the admissibility of evidence, even when made without consultation with the defendant, may operate to bar subsequent collateral attack. *See Wainwright v. Sykes,* 433 U.S. at 91 n. 14, 97 S.Ct. at 2508 n. 14; W. LaFave and J. Israel, *Criminal Procedure* § 11.6, pp. 56–57 and n. 20 (1984). If a strategic decision by defense counsel not to seek to suppress a confession may constitute a waiver of the claim that the confession was erroneously admitted, it would seem to follow that a strategic decision not to call the defendant as a witness at a suppression hearing, even when not made in full consultation with the defendant, should have a similar effect.

The cases suggesting that a different rule may be applicable to a decision whether the defendant will testify at trial, *e.g., Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983), are not controlling here. There is a difference between testifying at a trial that involves a determination of guilt or innocence and testifying at a preliminary hearing the purpose of which is to keep evidence from "the trier of guilt or innocence for reasons wholly apart from enhancing the reliability of verdicts". *Lego v. Twomey,* 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). Because of this difference, the defendant is not entitled to a jury trial on the issue of the admissibility of his confession, *id.* at 489–90, 92 S.Ct. at 626–27, the voluntariness of the confession need only be proved by a preponderance of the evidence instead of beyond a reasonable doubt, *id.* at 488, 92 S.Ct. at 626, and the rules normally governing the admissibility of evidence are not applicable to pretrial proceedings relating to the admissibility of evidence. Fed.R.Evid. 104.

Accordingly, where a defendant did not testify at a suppression hearing because he relied on the advice of counsel, the issue is best approached in terms of whether the advice was reasonable and whether, if the advice had been different, it would have affected the outcome of the hearing. *See Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *United States v. Vargas,* 920 F.2d 167, 170 (2d Cir.1990) ("Because [the defendant] argues only that counsel provided ineffective assistance by advising him not to testify on his own behalf, our finding that the advice was not unreasonable disposes of his claim.").

After considering the evidence, it seems plain that the petitioner has not met the burden of establishing either that the advice of counsel was unreasonable or that his testimony would have made a difference at the suppression hearing. The potential risks that would give any competent defense counsel reason to reflect carefully before advising a defendant to testify have already been discussed. On the record here, petitioner's counsel could reasonably have concluded that these risks were not worth taking. Specifically, as indicated in my order of December 16, 1988, petitioner's trial testimony on this issue was hardly persuasive. Although petitioner testified "that Detective Bankhead 'slapped me in the face twice and he punched me in my stomach once,'" petitioner concededly "made no contemporaneous complaint to the Assistant District Attorney or his parents" (when he was permitted to see them shortly thereafter). *Hemingway v.*

*Henderson,* No. 87–3806, slip op. at 5–6 (E.D.N.Y. Dec. 16, 1988). Indeed, he admitted he "never told anybody" that he had been beaten. Trial Tr. 367. On the other hand, if petitioner's testimony left something to be desired, Detective Bankhead's version of the events was equally unpersuasive. While I do not credit petitioner's claim that Detective Bankhead abused him physically, it is difficult to believe that Detective Bankhead removed petitioner to a private office—away from the Assistant District Attorney and the stenographer—simply to "remind" petitioner that the statement he had just given to the Assistant District Attorney was not like the one he had given earlier.

Under these circumstances, assuming he was aware of petitioner's claim of physical abuse, petitioner's attorney could have reasonably concluded that it would only shore up the credibility of an otherwise questionable presentation by the prosecutor if he put petitioner on the stand to testify to a version of the events that had significant aspects of implausibility. Rather than follow such a course, he could have concluded that the sounder strategy would be to argue that Detective Bankhead must have said or done something improper to induce petitioner to confess to the Assistant District Attorney and that the prosecution had failed to meet its burden of establishing that the confession was voluntary beyond a reasonable doubt. While the strategy did not prevail, it was not unreasonable.

■ The defendant now asks me to find that the confession was involuntary as matter of law. Under the holding in *Walker v. Wilmot,* he is entitled to a determination of the issue of voluntariness based on the entire record including his testimony before me. On the record here, even without the defendant's testimony, I would not

have made the same finding that the trial judge made had I been sitting as the primary finder of fact applying the more stringent New York standard for determining the voluntariness of the confession.[4] Because the prosecution bears the burden of proof with respect to critical events that occurred when Detective Bankhead and petitioner were alone in a private office, the failure of Detective Bankhead to provide a credible version of what transpired would have been a sufficient basis for a finding that the prosecution had failed to meet its burden of proof.

My role here, however, is not to try the facts *de novo* under the standard to which the New York cases pay lip service. Rather it is to determine whether the findings of historical fact made by trial judge are sufficiently supported by the record to justify the presumption of correctness that 28 U.S.C. § 2254(d) attaches to them.[5] Only the "ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985).

After reviewing the record, I am unable to conclude that the trial judge's findings of historical fact are so contrary to the record as a whole to overcome the presumption of correctness that attaches to them. While I find it difficult to credit the testimony of Detective Bankhead, I cannot say that the trial judge's decision to credit that testimony was so unreasonable that his credibility determination should be disregarded. Moreover, because I do not credit the petitioner's version of what transpired during the critical interval at issue here, I do not believe that it provides a

---

**4.** Under New York law, the District Attorney had the burden of proving that the confession was voluntary beyond a reasonable doubt. *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

**5.** Section 2254(d) provides that the trial judge's findings of fact "shall be presumed to be correct, unless the applicant shall establish, or it shall otherwise appear, or the respondent shall admit … that the record in the State court proceeding, considered as a whole, does not

sufficient basis for rejecting the trial judge's determination.[6] On the contrary, when a defendant chooses to testify, his testimony—if false—may be used to buttress a finding that the facts are the opposite of what the defendant has testified. *United States v. Weinstein*, 452 F.2d at 714 n. 14.

Close scrutiny, of course, is always required of any confession that has been given by a 16 year-old during custodial interrogation. *See Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 303, 92 L.Ed. 224 (1948). Such a confession, however, is not involuntary as a matter of law. *Fare v. Michael C.*, 442 U.S. 707, 725–26, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). Once the trial judge's findings of historical fact are accepted here, the circumstances do not support a finding that the petitioner's confessions were involuntary.[7] *Compare Haley v. Ohio*, 332 U.S. 596, 600, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948) (15 year-old interrogated by "police working in relays ... hour after hour, from midnight until dawn"); *Matter of Gregory W.*, 19 N.Y.2d 55, 277 N.Y.S. 2d 675, 224 N.E.2d 102 (1966) (12 year-old mentally disturbed child was detained in custody and questioned for 24 hours with little or no sleep); *Quartararo v. Mantello*, 715 F.Supp. 449 (E.D.N.Y.) (lengthy incommunicado interrogation of 14 year-old in violation of Family Court Act,

no advice of constitutional rights, false statement that accomplices had confessed and implicated the defendant combined with a promise that nothing would happen to defendant if he confessed), *aff'd*, 888 F.2d 126 (2d Cir.1989).

### Conclusion

In *Walker v. Wilmot* the Court of Appeals held that if petitioner's testimony was not credited, and the district court judge presiding over the habeas proceeding otherwise found no ground for granting the writ, he should enter a final judgment denying the petition. *Id.* at 1042. Because I do not credit petitioner's testimony and because there is otherwise no ground for granting the writ, the petition for a writ of habeas corpus is denied.[8]

SO ORDERED.

fairly support such factual determination." 28 U.S.C. § 2254(d).

**6.** My conclusion as to the defendant's credibility is not based merely on his demeanor while on the stand or the fact that he deliberately withheld material portions of the transcript of the suppression hearing when he was aware that they were missing from the file and that the District Attorney was unable to locate them. Petitioner failed to give a plausible explanation for his admission that he never told anybody that he had been beaten until he testified at his trial and the District Attorney who observed petitioner after he returned to make the second statement at issue here observed nothing to indicate that petitioner had been assaulted (Trial Tr. 375–378). Indeed, this may be the kind of case that one frequently sees in which a defendant feels that he can only succeed by exaggerating what happened to him. Specifically, after spending some 13 years in jail, petitioner seemed to me to be a quiet, soft spoken young

man. Although not without guile, it seems likely that, when he was sixteen years old, he was someone whom a law enforcement officer with the experience and stature of Detective Bankhead could easily have intimidated without resorting to physical abuse. This is what I suspect happened here.

**7.** The petition challenged only the voluntariness of the second statement that was made to the District Attorney. Petition at p. 6. At the hearing here, petitioner denied that he had implicated himself as a participant before he was beaten by Detective Bankhead. Habeas Corpus Hearing, Tr. 25, 30.

**8.** I wish to express my appreciation to petitioner's assigned counsel, Vivian Shevitz and Georgia J. Hinde, for their willingness to accept assignments in the cases such as this and for the extraordinarily able representation they have provided to this petitioner and others like him.