OPINION OF THE COURT
Ralph J. Porzio, J.
The respondent in this juvenile delinquency proceeding is charged with attempted assault in the first and second degrees and assault in the second and third degrees. Respondent has moved to suppress statements made by him to the police. This court held a pretrial Huntley hearing and this decision sets forth the court’s findings of fact and conclusions of law.
FINDINGS OF FACT
On September 4, 1997, at approximately 3 o’clock in the morning, detectives from the Brooklyn Child Abuse Squad went to respondent’s home as part of an investigation into injuries sustained by a nine-month-old child. The focus of the investigation at that point was the victim’s baby-sitter, Monica Perry, who was already in custody as the primary suspect. Respondent was also cared for by Ms. Perry, and the police were contacting the homes of all children that were present in her apartment that evening, when the incident occurred. There was substantial concern that the children, including the respondent, might have also been victims, or potential witnesses to the incident.
Upon the detectives’ arrival in the apartment, respondent was brought into the kitchen by his mother and asked what had happened to the baby. Respondent replied that the baby had fallen and hit her face. Due to the late hour, and to avoid disturbing other people in the apartment, the respondent’s mother was then asked if she and respondent would accompany *798 the detectives to the Brooklyn Children’s Advocacy Center (hereinafter Center). Respondent’s mother agreed.
Respondent and his mother arrived at the Center at approximately 3:30 a.m. They were seated in a small interview room, and were asked by the detectives to wait until a larger interview room became available. The respondent and his mother waited for about an hour before they were transferred to a larger interview room. Respondent’s mother testified that she and the respondent took naps on the couch while waiting to speak with the police. Additionally, the mother testified that although she wanted to leave the Center, she did not do so because she wanted to know what happened to the baby.
What occurred next is in dispute. The respondent’s mother testified that after she and her son were transferred to the larger interview room, they were separated for about 20 minutes by Detective Alonzo Hobbs who spoke with her outside of the room. She further testified that when she returned to the room, she observed Sergeant Lorraine McKenna and Detective Sheila Almond sitting at a table with the respondent, who was sobbing. Respondent was then asked to tell his mother what happened to the baby, whereupon he made an inculpatory statement.
Detective Hobbs, however, testified that he did not recall ever separating respondent from his mother. Sergeant Mc-Kenna and Detective Almond concurred that respondent and his mother were never separated. Detective Almond further testified that she commenced an interview with respondent at approximately 4:50 a.m.
When asked how the baby was injured, respondent again stated that the baby had fallen and hit her face. Detective Almond then told respondent that the baby could not have sustained her injuries by falling on the floor. Respondent then made the first of two inculpatory statements. Respondent stated that the baby was lying on the floor and he hit the baby in the face with a ball. Respondent also stated that he hit the baby with his hand and the head of a toy doll, bit the baby on the stomach, and poked the baby in the eye. The interview lasted for approximately 45 minutes.
Detective Almond then left the interview room for about 10 to 15 minutes, conferred with Sergeant McKenna, and telephoned the victim’s treating physician, Dr. D’Pasquali, at Kings County Hospital. From this conversation with Dr. D’Pasquali, Detective Almond learned that the victim’s injuries were caused by actions consistent with those offered by respondent’s *799 statement. After this conversation, Detective Almond returned to resume the interview with respondent.
Sergeant McKenna testified that she was concerned because respondent had made conflicting statements about how the baby’s injuries occurred. She was not sure if respondent may have been trying to cover up something for the baby-sitter out of fear, was trying to please the detective, or was confused. She told respondent that they needed to know which was the real story, and that the room they were in contains a “magic chair” that beeps when a child tells a lie. She then told respondent that she was going to leave the room and turn the chair on, and that he should think about what he was going to say. She told respondent to just tell the detective what had happened, and then left the room.
Detective Almond then asked respondent if there was anything else he had done to the baby. Respondent replied that he stood on the baby’s stomach, and repeated that he hit the baby in the head with a ball, and hit her with his hands and a doll’s head. Respondent was arrested at 6:50 a.m. At no time during either interview, or while the detectives were in respondent’s home, was respondent given Miranda warnings.
CONCLUSIONS OF LAW
It is conceded that respondent was never given his Miranda warnings. The issue before this court, therefore, is whether the statements made by respondent were the result of a custodial interrogation.
The Presentment Agency, at a Huntley hearing, has the burden of proving beyond a reasonable doubt that statements sought to be admitted into evidence were made voluntarily. (People v Witherspoon, 66 NY2d 973, 974 [1985].) Any person subjected to a custodial interrogation must be given Miranda warnings regardless of the severity of the act. (Berkemer v McCarty, 468 US 420, 434 [1984].)
The standard used to determine if a person is in custody is whether a reasonable person, in respondent’s position, innocent of any crime, would have believed that his or her freedom had been restricted in any way. (People v Yukl, 25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970].) Factors to consider in determining whether an individual is in custody include, but are not limited to, the amount of time spent with the police, whether his or her freedom of action was restricted, the location and atmosphere under which the questioning took place, the degree of cooperation exhibited, whether Miranda warn *800 ings were given, and whether the questioning was investigatory or accusatory in nature. (People v Centano, 76 NY2d 837, 838 [1990]; People v Bailey, 140 AD2d 356, 358 [2d Dept 1988].) Additionally, when dealing with juveniles, special care must be taken to ensure that their rights are protected. (Haley v Ohio, 332 US 596, 599-600 [1948]; Matter of Gregory W., 19 NY2d 55, 63-64 [1966].)
In this case, respondent made three separate statements to the police. The first was in the kitchen of his home, where he told the detectives that the baby fell and hit her face. The second and third statements were made at the Brooklyn Children’s Advocacy Center. Both of these statements were inculpatory, the respondent having described in detail how he injured the child.
Applying the above standard, and considering the factors listed, the court finds that the first two statements made by respondent were not the result of a custodial interrogation. The court does find, however, that respondent was in custody when he made the third statement.
Up until, and including, the time respondent made his first inculpatory statement, respondent and his mother exhibited a high degree of cooperation in accompanying thé officers to the Center, as well as during the course of the interview. Moreover, the first interview with the detective and Sergeant McKenna was not unduly long, lasting for approximately 45 minutes. The court credits the testimony of Detective Almond and Sergeant McKenna that respondent was not a suspect until after he made the first inculpatory statement. The court also credits the testimony of Detectives Hobbs and Almond, and Sergeant McKenna, that at no time was respondent questioned without his mother present.
Of particular importance to the court in arriving at its decision not to suppress respondent’s first inculpatory statement is the nature of the Brooklyn Children’s Advocacy Center. Sergeant Lorraine McKenna, commanding officer of the Brooklyn Child Abuse Squad, testified that the Center is a multidisciplinary, “first-of-its-kind” facility in an office setting that contains representatives of the Administration for Children’s Services, the District Attorney, the Police Department, Victim Services, social workers, and on-site pediatrics. Children who are potential victims of child abuse are brought to the Center as part of the investigative process, and to receive appropriate treatment and services.
Sergeant McKenna testified that the Center is specifically designed to be child-friendly. The Center contains a lounge, a *801 playroom, and a reception desk. The decor is very colorful, and includes a large fish tank and many toys with which the children can play. Sergeant McKenna also testified that there are three child interview rooms. These rooms are also decorated with many colors and have fish painted on the walls. The larger interview room is 20 feet by 20 feet, and contains a sofa, table, and chairs.
Sergeant McKenna stated that none of the interview rooms are equipped with locks on the doors; nor were respondent and his mother ever told that they could not leave the Center. Furthermore, respondent was never in the portion of the Center occupied by the Police Department.
The creation of the Brooklyn Children’s Advocacy Center raises an interesting and novel issue in that a child undergoing similar questioning in different environments would have different interpretations based on those environments. Ordinarily, a child, whether sought as a witness or a suspect, would be brought to a police precinct for questioning. Unlike the Center, a police precinct is not designed to be child-friendly, and may be intimidating to a young child regardless of the circumstances. The Center, however, with its playroom, lounge, and colorful decor, is a nonrestrictive environment designed to promote a relaxing and nonthreatening atmosphere for witnesses and victims of child abuse. Sergeant McKenna testified that children are brought there to be made comfortable.
It is reasonable to assume that a child in respondent’s position, and innocent of any crime, would nonetheless feel restricted if brought to a police precinct. However, it is also reasonable to assume that if the same child is brought to the Center he or she would not experience those feelings. Therefore, the court finds that a reasonable eight year old brought to the Brooklyn Children’s Advocacy Center under circumstances similar to those of respondent, innocent of any crime, would not have felt that his freedom was restricted or that he was not free to leave the presence of the police.
While not dispositive, respondent’s willingness to comply with the detectives’ investigative inquiry is a persuasive factor in determining that he was not in custody when he made the initial inculpatory statement. Moreover, respondent’s mother testified that she chose to remain at the Center, continuing to cooperate with the authorities, because she was concerned about the infant victim and wanted to know the cause of her injuries.
Considering the totality of the circumstances, particularly, the nonthreatening atmosphere of the Center, combined with *802 the high degree of cooperation exhibited by the respondent and his mother, the initial interview at the Center does not rise to the level of a custodial interrogation. The court finds that respondent’s first inculpatory statement was made “without apparent external cause, i.e., self-generating” (People v Stoesser, 53 NY2d 648, 650 [1981].) The statement was spontaneous; it was not the result of “inducement, provocation, encouragement or acquiescence”. (People v Maerling, 46 NY2d 289, 302-303 [1978].) Thus, suppression of the respondent’s initial inculpatory statement is not warranted. The statement made by respondent at his home, and the first inculpatory statement respondent made to the police, prior to the detective contacting the doctor, are admissible.
Respondent’s second inculpatory statement, made after Detective Almond’s conversation with Dr. D’Pasquali must, however, be suppressed. Detective Almond and Sergeant Mc-Kenna testified that respondent became a suspect and was in custody after they heard his first inculpatory statement. After speaking with Dr. D’Pasquali, Detective Almond returned to the interview room and specifically asked respondent if there was anything else he had done to the baby that he had not already told her. The accusatory tone of this question, and Sergeant McKenna’s remarks about a special chair beeping when a child lies, would lead a reasonable eight year old to believe that he or she was not free to leave the presence of the police. Furthermore, the detectives should have known that this conduct was “reasonably likely to evoke an incriminating response from the [respondent].” (Rhode Island v Innis, 446 US 291, 301 [1980].) Accordingly, it was incumbent upon them, at this time, to inform respondent and his mother of his Miranda rights. Having failed to do so, the court finds that the suppression of respondent’s second inculpatory statement is required.
In light of the foregoing, respondent’s motion to suppress statements made by him to the police is granted in part and denied in part.